GREGORY NICOLAYSEN, SBN 98544
27240 Turnberry Ln, Ste 200
Valencia, CA. 91355
Tel: (818) 970-7247
Fax: (661) 252-6023
Email: gregnicolaysen@aol.com
Attorney for Defendant
JOHN  BRINSON

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **No.: 2:17-CR-00404-AB** (2) |
| ) | |
| ) | **NOTICE OF MOTION AND** |
| ) | **MOTION TO SUPPRESS** |
| ) | **POST-ARREST** |
| Plaintiff, ) | **STATEMENTS AND FRUITS,** |
| ) | **FILED BY DEFENDANT** |
| ) | **JOHN BRINSON;** |
| vs. ) | **MEMORANDUM OF** |
| ) | **POINTS AND** |
| ) | **AUTHORITIES;** |
| ARLAN WESLEY HARRELL, ) | **DECLARATION OF JOHN** |
| et al., ) | **BRINSON** |
| ) | |
| ) | |
| Defendants, ) | **DATE: October 11, 2019** |
| ) | **TIME:  1:30 p.m.** |
| _____ _____ ) | **CTRM: THE HON. ANDRE** |
| | **BIROTTE, JR** |

1

**TO THIS HONORABLE COURT AND TO PLAINTIFF UNITED STATES, THROUGH ITS ATTORNEYS OF RECORD, ASSISTANT U.S. ATTORNEYS DEVON MYERS AND VANESSA BAEHR-JONES:**

**NOTICE IS HEREBY GIVEN** that on October 11, 2019, at 1:30 p.m., before the Honorable Andre Birotte, Jr., Judge of the United States District Court, located at 350 W. First Street, Los Angeles, CA 90012, defendant John Brinson, by and through his counsel of record, Gregory Nicolaysen, will respectfully move this Court for an order (1) suppressing all post-arrest statements made by Mr. Brinson and any fruits derived therefrom; and for this purpose, (2) granting an evidentiary hearing to establish facts that support the contentions addressed herein.

This motion is based on the case law cited in the motion and is brought pursuant to this notice of motion, the accompanying memorandum of points and authorities, the attached exhibits,  all papers contained in the district court file, the attached declaration of John Brinson, and any additional evidence the court permits counsel to introduce at the hearing on the motion.

By this motion, Mr. Brinson respectfully requests that the Court set an evidentiary hearing and direct the government to produce the agents who

conducted the post-arrest interview of Mr. Brinson without the necessity of a

defense subpoena, to give testimony regarding the subject of this motion.


DATED: August 01, 2019                    Respectfully Submitted,



                                          */s/  Gregory Nicolaysen*
                                          Gregory Nicolaysen
                                          Attorney for Defendant
                                          John Brinson

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

### A. Opening Statement

Defendant, John Brinson is charged in a First Superseding Indictment with the following violations: 18 U.S.C. 2252A(g) [Count 1, Engaging in a Child Exploitation Enterprise]; 8 U.S.C. 2251(a), (e) [Count 13, 14, Production of Child Pornography].

On June 13, 2017, Mr. Brinson was arrested outside a residence located in Fresno, CA. Immediately following his arrest, Mr. Brinson was taken to the Fresno County Sheriff's Office (FCSO) and was unlawfully interviewed without the presence of an attorney. The statements given by Mr. Brinson, together with any evidence derived from the interview, are the subject of this motion.

### B. Summary of Defendant's Contentions

At the time of his arrest, Mr. Brinson was taken into custody and interviewed without the presence of an attorney, *for nearly six and a half hours*.

4

The post-arrest interview was conducted by agent Greg Squire from the Department of Homeland Security (HSI) - Boston and agent John Kuzma from HSI - Los Angeles.  During the seemingly interminable interview, the agents violated Brinson's Miranda rights and used coercive means to undermine his ability to exercise free will, thereby rendering his statements involuntary.

A review of the post-arrest interview shows agents capitalizing on a young man who is in a conspicuous state of despair.  As discussed herein, the agents' violations are demonstrated by: (a) the agents' verbal interactions with Brinson; (b) observations of Brinson's body language, principally during the first hour of the interview; (c) the agents' manipulation of long pauses as a tactic to exert pressure on Brinson; (d) Brinson's request for counsel early in the interview; and (e) the agents' disregard for Brinson's request and persistence in forging ahead with the interview.

In short, the agents' technique is clear: ignore Brinson's assertion of rights; stress him out, and persist until he can no longer exercise any voluntary decision.

## C. **Statement of Facts**

For the first fourteen minutes and nineteen seconds (0:00 -14:19) of the videotaped interview, Brinson is left alone in the interview room.[1]

At 20:23, agent Squire reads Brinson his Miranda rights, but does not give Brinson a waiver form to sign.[2]

Immediately following the reading of the rights, and as no waiver form is signed, agent Squire launches into a lengthy statement that sets an agenda designed to nix any request for an attorney.  In an obviously manipulative style designed to trick Brinson into believing that he could freely make admissions without any self-incriminating consequences, the agent creates a false sense of security which is nothing short of a trap:

---

[1] A thumb drive containing the portions of the videotaped post-arrest interview that are cited in this motion will be lodged with this Court concurrently with the filing of the motion.  The thumb drive contains two of the four video files comprising the nearly six - hour interrogation.  Video file #1 on the thumb drive, Exhibit A, covers the first segment of the interrogation beginning at 11:10 hrs up through 13:06 hrs.  Video file #2, Exhibit B, covers the final segment of the interrogation from 16:34 hrs to 17:41 hrs.  The digital references to Exhibits A and B, are in minutes: seconds.  As an example: 21:15 to 24:28 means minute 21 and 15 seconds into the video, up to minute 24 at 28 seconds.
[2] Exhibit A 20:23 to 20:29

So I'm up for this being kind of an open conversation with you, okay, as we talk, best if it's honest kind of make it easier to talk about.  There's nothing that you can say that will surprise me… Before you answer anything, I just want to kind of lay out sort of where we're at… So you know what self preservation is? You heard of that kind of term before?  Like, protect yourself?…But now this dialogue that we're going to have it's your chance to sort of, provide feedback. To tell us your side of the story. And that's really important. Because when everything shakes out. And the lawyers look at everything, and the judges look at everything and the jury looks at everything, without you telling your side and you being able to help yourself, and advocate for other uh, other folks…. I don't think you don't like children. I think you do like children. You're a mentor. You're a…what are you a social sciences major or whatever it was there?  So. It's just going to be time to really know that everything is different moving forward today John.

7

Okay? It's just time to clean out your soul a little bit.
Unfortunately, friends that you have or had are not quite
as true and loyal as maybe they were before or maybe
they were willing to say they were before. So. Hearing
that, knowing that, I'd like to have a conversation with
you. I'd like to talk about this. What do you think? It's a
big step. But I think you're ready.[3]

Throughout this lengthy introductory statement by the agent, Brinson
sits quietly.  When the agent finally stops talking, Brinson continues to
remain silent for at least another minute and a half – an exceedingly long
stretch of time in a post-arrest interview setting.  It is the agent, not Brinson,
who breaks the silence; and he does so by once again launching into a
persistent effort to get Brinson to speak[4]:

Today is day one, you gotta push forward now.

As before, Brinson remains silent for at least a minute.

_____

[3] Exhibit A 20:43 to 24:27.
[4] Exhibit A 25:47 to 25:51

8

And once again, it is the agent who breaks the silence by pushing Brinson with the following remark:[5]

So, tell me about            .

For the first time, Brinson does speak.  And what he says goes squarely to the heart of his Fifth Amendment rights:[6]

You said I could have an attorney present.

Instead of stopping the interview at that moment and affirming that Brinson is entitled to have a lawyer present before any further questioning resumes, the agent shrewdly pushes forward with the interview, stating that Brinson does not have to "talk about everything."  By this remark, the agent blows off Brinson's assertion for an attorney:[7]

_____

[5] Exhibit A, 26:55 to 26:57.
[6] Exhibit A, 27:04 to 27:06.
[7] Exhibit A, 27:07 to 27:44.

9

>       If we are going into questioning, right, and if you want at
>
>       some point if there is something you don't want to cover
>
>       then we can stop.   Okay. I'd like to get through a few
>
>       basic things…..You don't have to talk about everything.

Again, Brinson remains silent.

This time, the silence extends for six long minutes,[8] all the while Brinson's head is face down on the table or pressed against his hands, depicting clear signs of stress under the pressure by agents to proceed with the interview.  Repeatedly, the agents pressure Brinson to talk about "Soole" (co-defendant Harrell) and "                " (the forum referenced in the Indictment).  The video shows Brinson in a state of visible discomfort, hunched forward, rocking back and forth in his chair, placing his hands over his face and running his fingers through his hair in a demonstrative display of increased agony.  Blatantly disregarding Brinson's behavior that clearly signals a desire to exercise his right to remain silent, agent Squire presses on, stating: "If you can help us we can help you."[9]

_____

[8] Exhibit A, 27:06 to 32:05.
[9] Exhibit A, 31:08 to 31:13.

10

During this six-minute period, Brinson remains almost completely silent, most of this time with his head face down on the table, speaking only to ask if he can use the restroom. When asked by the agent if he had to "go pee," Brinson held up not one but two fingers – making it clear that this was not simply urination.[10]

After returning from the restroom, Brinson continued sitting silently. He then asks, "Am I under arrest?", to which the agent responds, "Yeah."[11] After Brinson continues being silent, agent Squire resumes putting on the pressure, telling Brinson that it is "day one"[12] and "gotta take care of yourself."[13]

Another long stretch of silence ensues. For nearly five minutes, Brinson sits quietly. It is clear from the videotape that his struggling has escalated to a state of sheer agony.[14] Clearly, Brinson's intention all along had been to exercise his right to remain silent.

---

[10] Exhibit A, 35:23 to 35:29.
[11] Exhibit A, 39:18 to 39:20.
[12] Exhibit A, 39:55 to 39:57.
[13] Exhibit A, 41:21 to 41:23.
[14] Exhibit A, 41:35 to 46:06.

11

At 46:06, Brinson states, "I don't know what to do." The agent jumps on this as an opportunity to control the moment, responding with another long speech:[15]

> Like I said this is a fresh start for you. The whole gravity of this that has been sitting on you, you're a spiritual guy right? You know what the right thing to do moving forward is. You done what you done, man, that stuff is literally in the past, okay, so now you need to help yourself, okay? …what did you do moving forward, to help out and do the right thing. I don't know if all that stuff is true. But I'm willing to listen.

Brinson does not accept the agent's so-called invitation.  He is overwhelmed by stress and unable to think clearly.  At 49:01, he states, "I'm about to throw up." Agent Squire's response shows a tactical delight in sustaining Brinson's stress: "Yeah, that's a bucket right behind you man, if you want it"[16]   Unable to reach for the bucket without vomiting, Brinson

---

[15] Exhibit A, 46:09 to 47:25.
[16] Exhibit A, 41:02 to 49:05.

asks the agents to hand it to him; but neither one does.[17]  Ignoring Brinson's request, agent Squire seizes the opportunity to exploit Brinson's distress by pressing him to make statements:[18]

> What you say here, is here right now, I'm not trying to tell anyone else about it... Start with something small and easy, something that won't make you throw up.

At this point, the video depicts Brinson as visibly ill and trying not to vomit.  For nearly six minutes, the agents relentlessly present Brinson with questions about                    ,[19] during which the agents show no regard for his condition.  They do not offer him water or a break, or even so much as get up to bring him the trash can.  Keeping the pressure on, agent Squire states, "this is very easy man."  Brinson replies "I can't."[20] – a clear

_____

[17] Exhibit A, 49:06 to 49:08.
[18] Exhibit A, 49:24 to 49:55.
[19] Exhibit A, 49:56 to 56:10.
[20] Exhibit A, 56:11 to 56:13.

13

communication that Brinson wants the interrogation to end.  Once again, agent Squire ignores Brinson and keeps the pressure on:[21]

> I know, the first steps the hardest man, first day of training is the hardest, first day of getting this off your chest is the hardest…I'm telling you honestly that everyone else does the same thing. Start with a simple question and then you move forward…You gotta get through that first one man, okay? And then you start moving forward…You can help yourself here.

Again, Brinson remains silent.

And again, agent Squire breaks the silence with persistence: "Tell me about Arlan, how'd ya meet?"[22]

At this stage, the interrogation has _reached the one hour point_, at which the agents tell Brinson:[23]

--------------------------------

[21] Exhibit A, 56:14 to 57:10.
[22] Exhibit A, 57:46 to 57:51.  The reference to "Arlan" is lead defendant Arlan Harrell.
[23] Exhibit A, 1:00:05 to 1:00:26.

14

> When we do this, right?  When we do this.  So what
> happens man, is this. We take information that you give us,
> okay? and if we run out and do what Arlan did? That goes
> toward you. It gives you credit.

Again, Brinson does not take the agent up on his so-called invitation. Instead, he holds his stomach and says, "[expletive] I'm sick."[24]  It is now almost past the one-hour point, and the agents do not stop.  They keep pushing forward.

At this point, Brinson breaks down and begins talking about the circumstances of this case.

The interrogation continues for another five and a half hours, at the end of which the agents state:[25]

> We will present your cooperation…those are points of
> cooperation.

_____

[24] Exhibit A, 1:00:37.
[25] The excerpt quoted above can be found in Exhibit B at 52:37 to 52:58.

15

After having refused Brinson's request for an attorney, the agents tell Brinson cavalierly that he will get an attorney "tomorrow" – i.e., now that they are done with him, he can have an attorney.

Exhausted at the end of the nearly six-hour ordeal, Brinson turns to agent Squire and to confirm that if he (Brinson) had continued to assert his right to an attorney, he would have hurt himself legally by losing the opportunity to get credit for cooperating – a clear sign that early on in the interrogation, agent Squire had succeeded in manipulating Brinson into foregoing his constitutional right by instilling the belief that it was more important for Brinson to get cooperation credit from the agents than to get an attorney.[26]

Indeed, the exchange between Brinson agent Squire leaves no doubt as to the agents' underlying agenda, which was to get Brinson to forego his constitutional rights by leading him to believe that cooperation was more important than his right to counsel:[27]

_____

[26] Exhibit B, 53:29 to 53:37
[27] Exhibit B, 53:38 to 54:10.

16

Yeah. It isn't cooperating.  That's exactly what it is. So. The
fact that you did cooperate with us and discussed everything
is helpful.  There's no question about it. Before we talked
we didn't know any side of your story. We didn't know any
of what we discussed today. So the fact that you cooperated
that's on us. We go back and we say "yup" we tell the
attorney that, ya know, you did cooperate, and that goes
toward you.

After being subjected to pressure for an entire hour, Mr. Brinson
finally caved in and gave statements which are now the subject of this
motion.


II.

THIS COURT SHOULD SUPPRESS THE STATEMENTS

MADE BY MR. BRINSON IN HIS POST-ARREST INTERROGATION

DUE TO A VIOLATION OF HIS *MIRANDA* AND

FIFTH AMENDMENT RIGHTS

## A. <u>Applicable Standards</u>

The standards for determining whether a defendant's statements to law enforcement are involuntary was summarized as follows by the Ninth Circuit in <u>United States v. Miller</u>, 984 F.2d 1028 (9th Cir. 1993):

> The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment. <u>Colorado v. Connelly</u>, 479 U.S. 157, 163, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986). Both physical and psychological pressure can lead to involuntary confessions. <u>Blackburn v. Alabama</u>, 361 U.S. 199, 206, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960). While a confession accompanied by physical violence is per se involuntary, see <u>Stein v. New York</u>, 346 U.S. 156, 182, 97 L. Ed. 1522, 73 S. Ct. 1077 (1953), psychological coercion provokes no per se rule. <u>Haynes v. Washington</u>, 373 U.S. 503, 515, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963).

> In psychological coercion cases, we must consider the totality of the circumstances involved and their effect upon the will of the

defendant. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); <u>United States v. Guerrero</u>, 847 F.2d 1363, 1365-66 (9th Cir. 1988). The pivotal question in each case is whether the defendant's will was overborne when the defendant confessed. <u>Schneckloth</u>, 412 U.S. at 225-26; <u>United States v. Tingle</u>, 658 F.2d 1332, 1335 (9th Cir. 1981).

<u>Miller</u>, *supra*, 984 F.2d at 1030-31.  *See*, <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961) (holding that test for voluntariness is whether the confession was product of essentially free and unconstrained choice by its maker).

The determination as to whether a defendant's statements to law enforcement were involuntary involves a combination of factors, which includes an assessment of coercive police behavior.  <u>United States v. Preston</u>, 706 F.3d 1106, 1113-1114 (9th Cir. 2013) ("Coercive police activity is a necessary predicate to [a] finding that a confession is not voluntary."), citing <u>Connelly</u>, 479 U.S. at 167.  Other relevant factors include the length of the interrogation, its continuity, and the defendant's maturity, education, physical condition, and mental health.  <u>Withrow v. Williams</u>, 507 U.S. 680, 693-694 (1993). "It is not sufficient for a court to consider the circumstances

19

in isolation. Instead, 'all the circumstances attendant upon the confession must be taken into account." <u>Doody v. Schriro</u>, 596 F.3d 620, 638 (9th Cir. 2010), quoting <u>Reck v. Pate</u>, 367 U.S. 433, 440 (1961).  Inducements generally serve to invalidate a confession. *See, e.g.*, <u>Brady v. United States</u>, 397 U.S. 742, 754 (1970) (holding that when accused is "in custody, alone and unrepresented by counsel . . . even a mild promise of leniency [has been] deemed sufficient to bar the confession … because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess.").

The combination of factors underscoring the voluntariness analysis likewise takes into account the interplay between the tactics utilized by the agents in tandem with the defendant's underlying motivation to benefit himself.  In addressing this delicate balance, the Supreme Court has observed that "in cases where the statement was made under circumstances where it is likely that the declarant had a significant motivation to obtain favorable treatment, as when the government made an explicit offer of leniency in exchange for declarant's admission of guilt, the entire statement should be inadmissible.").  <u>Williamson v. United States</u>, 512 U.S. 594, 620 (1994) (Kennedy, J., concurring).

The analysis as to whether a defendant's statements are involuntary and whether the defendant has effectively waived his <u>Miranda</u> rights involves overlapping factors.  In this context, the Ninth Circuit has held, in an *en banc* opinion, that "[t]he standard of review does not change when the inquiry shifts from the voluntariness of the confession to the voluntariness of an asserted <u>Miranda</u> waiver."  <u>Collazo v. Estelle</u>, 920 F.2d 411, 415 (9th Cir. 1991).  In quoting the excerpt below from <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987), which in turns cites to <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986), the Court in <u>Collazo</u> made it clear that "the inquiry whether a waiver is coerced has two distinct dimensions" and that "as with the voluntariness of a confession, the voluntariness of a <u>Miranda</u> waiver is decided by first examining objectively the methods the police used to produce the waiver." 940 F.2d at 416.  The <u>Collazo</u> opinion further explains:

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances

surrounding the interrogation' reveal both an uncoerced choice and

the requisite level of comprehension may a court properly

conclude that the Miranda rights have been waived."

Collazo, 940 F.2d at 415-416.

In applying the Ninth Circuit's standards to this case, the

circumstances addressed in Collazo are worth noting.  There, the petitioner

had been arrested on suspected murder and burglary charges. He was read

his Miranda rights, declined to waive them and asked to speak to an

attorney. One of the interrogating police officers told him that "it might be

worse" for him if he talked to an attorney, and that it was in his interest to

talk to them without an attorney. Three hours later, petitioner was again

advised of his Miranda rights, at which time he indicated that he had

changed his mind about speaking to an attorney and confessed to his

participation in the crimes.

After his conviction, petitioner sought post-conviction relief.

Ultimately, the Ninth Circuit reversed the district court's denial of the

habeas petition, finding that the confession, which was admitted at trial, was

"involuntary and its use to convict him violated his Constitutional rights."

940 F.2d at 413. In so holding, the Court applied the overlapping standards

in separately discussing the voluntariness claim and <u>Miranda</u> violation

claim.  First, the Court addressed the <u>Miranda</u> issue:

> We now examine Officer Destro's response to Collazo's initial
>
> assertion of his *Miranda* rights. We must determine, as a
>
> threshold matter, whether Officer Destro's attempt to
>
> discourage Collazo from speaking to a lawyer is compatible
>
> with a system of justice that does not permit police coercion.
>
> We conclude it is not, and we so conclude for a multitude of
>
> reasons.

<u>Collazo</u>, 940 F.2d at 416.

The Court then turned to the voluntariness issue:

> First, applying the traditional Fifth Amendment voluntariness
>
> test, Officer Destro's nine terse sentences, understood plainly,
>
> were coercive. His words were calculated to pressure Collazo
>
> into changing his mind about remaining silent, and into talking
>
> without counsel to his interrogators. Destro's warning that it
>
> "might be worse" for Collazo if he did not cooperate with the
>
> police can only be seen as menacing. During the suppression

hearing, the prosecutor himself characterized Officer Destro's

tone and presentation as "insistent." The tape of the interview

confirms this description.

Collazo, 940 F.2d at 416.

The Ninth Circuit has recently endorsed the analysis in Collazo.  In

Rodriguez v. McDonald, 872 F.3d 908 (9th Cir. 2017), the Court evaluated

whether the confession of Petitioner, who was fourteen at the time, was

obtained in violation of both Miranda and the Fifth Amendment.  Adopting

the analysis in Collazo, the Rodriguez court held in favor of petitioner on

both grounds, finding that the waiver was involuntary and the subsequent

confession coerced.  Relevant portions of the analysis in the opinion, which

directly applies to defendant Brinson's motion here, is quoted below:[28]

> The voluntariness of a suspect's waiver — like the
>
> voluntariness of a subsequent confession — is assessed
>
> by examining both the police methods used to produce

_____

[28] The quotation marks within the excerpts of the opinion are taken from the record
before the Court.  Brackets in the quoted excerpt are by counsel for defendant Brinson.
Parentheses in the excerpt are within the Rodriguez opinion.

the waiver and the individual characteristics of the

suspect to determine whether the suspect's will was

overborne. [citing <u>Collazo</u> at 415-16].

  ***

After Mr. Rodriguez asked for a lawyer, the officers

continued to pressure him. Though Mr. Rodriguez had

repeatedly denied participating in the shooting, the

officers told him he would be charged with murder later

that day, increasing the urgency of cooperation. An

officer reminded Mr. Rodriguez that they had "tried to

give (him) the opportunity to straighten things out,"

recalling the officers' earlier promises of leniency.

  ***

Turning to the other prong of the voluntariness inquiry,

the tactics employed by police in this case further support

the conclusion that Mr. Rodriguez's confession was not

voluntary. The officers suggested to Mr. Rodriguez that

cooperation would result in leniency: they told him they

would take "what you tell us" to the district attorney "and

say, hey man, you know what, this guy — we think —
he's — you know, he's 14 maybe there was a little bit of
influence from the other guys the older guys, you know,
he still — we can still save him he's not an entirely bad
dude." Even more explicitly, they suggested that
cooperating was the only way to "save (his) life": "I
mean, that's it what's done is done, but this is like the rest
of your life now, this is the difference, you('re) only 14,
man. It's not like you're 18, 19 and you know, you're 14
years old, man, *you can still save your life. You still have
a lifetime*." [Italics in original] Further: "You got a
chance to set things right, take responsibility for what
you did, and then whatever happens happens but be
assured that what we would like to do is talk to the
district attorney tell him that you were cooperative and
being truthful and [accept] the responsibility."

       \*\*\*

The voluntariness of a suspect's waiver of his Miranda
rights—like the voluntariness of a subsequent

26

confession—is assessed by examining both the police methods used to produce the waiver and the individual characteristics of the suspect to determine whether the suspect's will was overborne.

***

Because this pressure followed Mr. Rodriguez's invocation of his right to counsel, it constituted "badgering" in direct violation of *Miranda* and *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)] [internal citations omitted].  At a point where the law required (the officer) to back off, he did not 'scrupulously honor' (Mr. Rodriguez's) right to cut off questioning; he stepped on it." [citing Collazo at 417]. Particularly in light of Mr. Rodriguez's special vulnerabilities to coercion, [internal citations omitted]*,* we hold that these coercive police tactics overbore Mr. Rodriguez's will, and that his waiver of his previously invoked right to counsel was not voluntary.

Rodriguez, 872 F.3d at 922-924.

**B. <u>Under The Totality Of Circumstances Test, Brinson's</u>**

**<u>Statements Were Involuntary Because His Will Was</u>**

**<u>Overborne When He Made Incriminating Statements</u>**

**1. <u>The Agents Utilized Tactics of Deception And</u>**

**<u>Coercion To Discourage Brinson From Exercising</u>**

**<u>His Right To An Attorney</u>**

In the present matter, the actions of agents Squire and Kuzma in conducting Brinson's post-arrest interrogation fall squarely within the purview of the conduct deemed unlawful by the Ninth Circuit in <u>Collazo</u> and <u>Rodriguez</u>. A review of the videotape, summarized earlier in this motion, demonstrates their systematic and continual attempts to discourage Brinson from speaking to an attorney. In employing tactics that eventually succeeded in getting Brinson to give in, the agents engaged in coercive behavior that began immediately following the reading of Miranda rights.[29]

---

[29] Exhibit A, 20:42 to 23:29; 23:59 to 24:24. Selected excerpts from this portion of the interrogation have been quoted in the Introductory section of this motion.

28

Of note is the shrewd tactic by agent Squire to cut Brinson off immediately after reading his rights in saying to Brinson, "Before you say anything" and launching into a speech that is clearly designed to discourage Brinson from asserting his right to an attorney.  In essence, what the agent is really saying to Brinson is this: "Mr. Brinson, before you exercise your right to an attorney, which would require us to stop talking with you, I'd like to discourage you from exercising that right and have a conversation with you without the presence of an attorney so that you can lay yourself out and at the same time give me all the information I need from you."  As the Ninth Circuit did in <u>Collazo</u> and <u>Rodriguez</u>, this Court should read through the façade of the agents' tactics and cull the underlying strategy of manipulation that directly undermined Brinson's rights.

These tactical maneuvers segue both with the voluntariness analysis and with the Miranda violation analysis.  From the latter perspective, agent Squire's calculated response to Brinson's request for a lawyer[30] is tantamount to a failure to properly advise Brinson of his constitutional right to an attorney, as the agent's tactic of disregarding Brinson's invocation by

---

[30] Exhibit A, 27:07 to 27:44

launching into a narrative that redirects the focus of the interrogation was a ploy designed to confuse Brinson.  Tactics that create confusion, mixed together with the repeated and prolonged nature of the questioning, are relevant factors in the Fifth Amendment analysis. See Schneckloth, 412 U.S. at 226.

As the excerpts quoted earlier show, the agents' tactics during the interrogation inflicted continual psychological stress on Brinson, as they repeatedly used terms and phrases aimed at pressuring Brinson to cave in, expressions such as , "day one, gotta push forward"[31] and statements that include the phrase, "you can help yourself here."[32]  Such tactics are directly on point with the discouragement and promises of leniency recognized by the Ninth Circuit as violative of Fifth Amendment rights,  *E.g.,* Rodriguez, 872 F.3d at 923-924.

Agent Squire's tactics continued unabated even after Brinson's statement, "You said I could have an attorney present."[33]   Instead of

---

[31] Exhibit A, 25:49 to 25:50.
[32] Exhibit A, 56:14 to 57:10.
[33] Exhibit A, 27:04 to 27:06.

30

responding in the affirmative and terminating the interview based on

Brinson's assertion of his right to counsel, agent Squire shrewdly

circumvented Brinson's request by redirecting the interrogation in telling

Brinson that the parameters of the interview were within Brinson's control –

when in fact it was the agent setting the agenda.

      Of course, the agent's comments were sheer window dressing because

Brinson had already asserted his right to counsel, and the agent had no

intention whatsoever of relegating any control to Brinson.  Instead, the agent

dangled before Brinson the unsettling dilemma between choosing between

exercising his constitutional right to counsel, on the one hand; and

cooperating with the agents, for which he would have to forego his rights.

Intent on ensuring that Brinson elected the latter, the agent wasted no time in

launching forward with lengthy narratives, demanding that Brinson "get

through some basic stuff."[34]   Utilizing such phrasing as "basic stuff" was

once again nothing more than sheer manipulation, as agent Squire was *fully*

---

[34] Exhibit A, 27:08 to 27:38.

aware that there was nothing "basic" about the questions he was posing or the answers he was seeking to elicit from Brinson.

Indeed, after blowing off Brinson's request for counsel and under the innocuous pretense of discussing "basic stuff," the agent was digging directly into the heart of the case in seeking to have Brinson inculpate himself completely before ever consulting with an attorney.  The pretenses used by agent Squire here unconstitutionally blurred the critical line between "express questioning", as the agent would have Brinson believe was being conducted; compared with questioning aimed at getting Brinson to incriminate himself, which was precisely the agent's game plan.  This distinction has not been lost on either the Ninth Circuit nor the Supreme Court in the Fifth Amendment analysis. Rodriguez, *supra*, 872 F.3d at 908, quoting Rhode Island v. Innis, 446 U.S. 291, 302 n. 8 (1980) (defining interrogation as either "express questioning" or "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response").

Manipulations of this type have Fifth Amendment implications and closely track those that were held unconstitutional by the Ninth Circuit in Henry v. Kernan, 197 F.3d 1021 (9th Cir. 1999).   In Henry, the Ninth

Circuit reversed the district court's admission of defendant's statements, holding that they were involuntary and also given in violation of Miranda. The Court's observations of the deceptive practices by law enforcement are instructive here:

> We conclude that the slippery and illegal tactics of the detectives overcame Henry's will and that he continued his confession only as a result of their deception. Officer White's statement that "what you say can't be used against you right now" was deliberately designed to undermine Henry's ability to control the time at which the questioning occurred, the subjects discussed, and the duration of the interrogation. Such misleading comments were intended to convey the impression that anything said by the defendant would not be used against him for any purposes. White's further comment that "we just want to know" reinforced that false impression by suggesting that the officers merely sought to satisfy their curiosity.

Henry, 197 F. 3d at 1027-1028.

The <u>Henry</u> court took issue with the fact that after the defendant expressed his desire for an attorney the detectives ignored his inquiries and responded by firing questions at Henry, such as:

"Why did you shoot him?"

<u>Henry</u>, 197 F. 3d at 1027.

The interrogators proceeded to interrogate Henry for an hour. <u>Id</u>. In the present matter, the agents acted with the same type of "slippery and illegal" tactics addressed in <u>Henry</u>.  <u>Id</u>. Shortly after invoking his right to an attorney, Brinson sat silently, not saying a word, for approximately five long minutes during which the agents continually imposed questions they wanted answers to:

Nothing surprises us John, this isn't the kind of thing you can talk about with buddies down at the bar.[35]

When did you first find           ? Maybe a year ago.

.[36]

_____

[35] Exhibit A, 28:05 to 28:10
[36] Exhibit A, 28:33 to 29:03

34

Did Soole turn you to it? Did Arlan tell you where it was?[37]

You don't have to nail down a specific date. It's not a good

situation. But like I said, we talked to Soole, Arlan.[38]

What you say here, is here right now, I'm not trying to tell

anyone else about it.[39]

These tactics closely track those in <u>Henry</u> that the Ninth Circuit flat-out rejected.  Accordingly, this Court should reach the same conclusion as in <u>Henry</u> in finding that the agents' deceptive and coercive tactics violated Brinson's Fifth Amendment rights and rendered his statements inadmissible as being involuntary and also being obtained in violation of <u>Miranda</u>.

**2.** <u>**Brinson's Physical Condition Deteriorated During The First Hour Leading Up To His Eventual Submission To The Agents**</u>

_____

[37]Exhibit A, 29:15 to 29:20
[38]Exhibit A, 30:43 to 30:46
[39] Exhibit A, 49:23 to 49:29

35

This factor weights strongly in favor of suppression.  The videotape of the first hour of Brinson's interrogation reveals that Brinson's demeanor and posture are characteristic of someone under extreme anxiety, fear, and stress.[40]  He remains silent for extended periods of time after agent Squire's intentionally deceptive response to his request for an attorney.  Despite all of these signs of stress and fear, and as he sits silently for extended periods of time, the agents continue to torpedo Brinson with questions that visibly wear Brinson down over the first hour.

As the agents apply these coercive tactics in repeatedly bombarding Brinson with questions and statements and disregarded his condition, the video shows Brinson becoming visibly ill.  He asks to be excused to the bathroom so that he may empty his bowels[41] and although the agents accommodate him, upon his return he remains visibly ill.  This progresses to the point where Brinson implores the agents that he is going to vomit and asks for the trash can to vomit in.  As a clear tactic of coercion, the agents refuse his request; instead of handing Brinson the trash can or offering him a

---

[40] Exhibit C is a collection of still photographs taken from the videotaped interview.
[41] Exhibit A, 35:26 to 35:33.

36

rest break or some water, agent Squire tells Brinson to get it himself.[42]  What makes this tactic even more coercive is the visible transition in behavior by which the agents' questioning becomes even more aggressive in an attempt to capitalize on Brinson's obvious physical pain and discomfort.

The agents used Brinson's weakened state along with lies to wear him down.  The fact that he *still* remained silent for long stretches during the first hour shows his commitment to exercise his constitutional right to remain silent and seek counsel; but the agents would have none of it.

The *first* time in the interrogation that Brinson begins to answer questions is one hour into the session.  It is clear from the video that his submission is borne out of pain and distress.  Indifferent to all of this, the agent asks "When did you find          ? A year-ago something like that?" Brinson responds "Sure".[43]  It is clear, even to agent Squire, that Brinson is only succumbing to the questions as a result of his physical state coupled with the agent's refusal to let up on him.  By the time Brinson caves in at the one-hour point, he was completely drained from agent Squire's aggressive persistence.

---

[42] Exhibit A, 49:01 to 49:09
[43] Exhibit A, 49:49 to 50:07

In a manner suggestive of awareness that a defense motion to suppress might be forthcoming, agent Squire inserted choice expressions nearing the one-hour point as Brinson showed obvious signs of wearing down. Clearly seeking to protect the record by trying to make it all appear voluntary, the agent says to Brinson, "I don't want to put words in your mouth."[44] This tactical ploy cannot, however, obscure the reality of the agent's coercive maneuvers.

### 3. Length Of Interrogation

This factor weighs strongly in favor of suppression. The agents pressure Brinson for the entire first hour before he makes any incriminating statements, during which the devious tactics discussed above are employed and the video shows Brinson visibly agonizing in his chair and in noticeable physical discomfort.

In total, the interrogation lasts nearly five and a half hours – a clear sign that the agents had no interest in honoring Brinson's invocation of his

---

[44] Exhibit A, 50:08 to 50:10

right to counsel.[45]  Their objective was simply to squeeze him for every item of information possible before he ever spoke with an attorney.

The confession obtained in the present matter was not a product of Brinson's free will.

## 4. Miranda Violation: Failure To Terminate Interrogation Upon Invocation Of Right To Counsel, And Absence Of A Knowing And Intelligent Waiver Of Rights

At minute 39 on the videotape – i.e., ten minutes after having requested an attorney --  Brinson asks, "Am I under arrest?"  This confounding question further confirms Brinson's debilitated and confused mental state.  A person who was not under the stress, anxiety, and confusion induced by the agents would surely have realized that they were under arrest.

This confusion also demonstrates that Mr. Brinson could not have "intelligently" waived his rights; nor could he have "relinquished his rights with full awareness of the nature of the rights and the consequences of the decision." Patterson v. Illinois, 487 U.S. 285, 292 (1988).

---

[45] Exhibit A, 26:50 to 27:44

At minute 56, while Brinson has yet to say anything substantive to the agents and is already appearing visibly ill, agent Squire demands that Mr. Brinson "start easy, something easy man," Brinson responds, "I can't." Brinson clearly expressed his desire to stop the interview. The interview should have immediately terminated. However, agent Squire simply ignores Mr. Brinson's plea by stating, "I know," and continues pressuring Brinson to answer his questions.

Beyond the voluntariness analysis discussed above, these tactics by the agent directly undermined Brinson's right to counsel and his right to knowingly and voluntarily waive his rights if the interview were to properly continue.  Without any regard for either right, agent Squire continues his Blitzkrieg-like attack upon Brinson by stating, "we're here man, this is where we're at..."[46]

The videotape clearly shows Brinson's inability to think clearly and escalating stress.  As agent Squire continues his unrelenting pressure, Brinson's head remains on the table and he covers his head with his arms to shield himself from Squire's attack. Again, the interview does not terminate.

---

[46] Exhibit A, 56:25 to 56:29

The continual and persistent questioning of the agents, the extreme stress and anxiety, Brinson's helplessness, combined with the fact that Brinson inquired about having an attorney, illustrates that Brinson's statements were not the product of "free and deliberate choice." Kirkpatrick v. Chappell, 872 F.3d 1047, 1055 (9th Cir. 2017). The endless and relentless questioning by the agents amounted to improper inducement such that Brinson's free will was overborne. Moran, 475 U.S. at 421.

### 5. The Agents' Actions Constitute Improper Inducements That Violated Brinson's Fifth Amendment Rights

The agents frame the *entire* interrogation as if speaking to them without consulting an attorney will be rewarded as cooperation with resulting leniency. By dangling such inducements, the agents instilled a false sense of security in regard to any legal benefits Brinson could expect to receive and diverted the discussion away from Brinson's exercise of his constitutional rights, as he clearly had expressed a desire to consult with counsel. The videotape is replete with examples of the types of remarks made by the agents to induce compliance and thus forego the exercise of rights, all the while wearing Brinson down for the entire first hour as he agonized in his

41

seat and sat silently for long stretches of time while the agents barraged him

with questions and statements, a few of which are listed here:

> Self-preservation is John taking care of John right now.[47]
>
> If you can help us, we can help.[48]
>
> You gotta go for yourself right now.[49]
>
> What is important is taking that next step. [50]
>
> You gotta take care of yourself.[51]
>
> You done what you done man. That stuff is literally in
>
> the past.  So now you gotta help yourself, okay?[52]

What you have to think about an hour from now a day from

now. Little steps. So what did you do moving forward. To help

out.[53]

---

[47] Exhibit A, 30: 59 to 31:03
[48] Exhibit A, 31:09 to 31:14
[49] Exhibit A, 31:41 to 31:44
[50] Exhibit A, 33:15 to 33:18
[51] Exhibit A, 41:20 to 41:22
[52] Exhibit A, 46:32 to 46:45
[53] Exhibit A. 46:55 to 47:09

42

Because when everything shakes out. And the lawyers look at everything, and the judges look at everything and the jury looks at everything, without you telling your side and you being able to help yourself[54]

This Court should not tolerate such manipulative gamesmanship by the agents.  The videotape amply establishes that Brinson was far too sensitive to inducement in this setting and that suppression is warranted on this basis alone.  <u>Moran,</u> 475 U.S. at 421.

---

[54] Exhibit A, 23:59 to 24:24

43

III.

## AN EVIDENTIARY HEARING SHOULD BE CONDUCTED WITH TESTIMONY FROM THE AGENTS

This motion satisfies the requirement of presenting a *prima facia* showing sufficient to warrant an evidentiary hearing on the issues addressed herein.

Accordingly, Mr. Brinson respectfully requests that the Court schedule an evidentiary hearing and issue an order directing the agents who conducted the post-arrest interrogation of Brinson to appear to give testimony without the need for a subpoena.

Pursuant to Federal Rule of Criminal Procedure 26.2, Mr. Brinson further requests an order from this Court directing the government to produce all statements of the witnesses at the hearing that pertain to the subject matter of their testimony.

DATED: August 01, 2019          Respectfully Submitted,


                                */s/  Gregory Nicolaysen*
                                Gregory Nicolaysen
                                Attorney for Defendant
                                John Brinson

44